**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

DARLEA FELDER,

               *Plaintiff,*

    v.

COMMONWEALTH OF
PENNSYLVANIA DEPARTMENT OF
CORRECTIONS,

               *Defendant.*

CIVIL ACTION
NO. 21-1556

PAPPERT, J.                                                                   February 3, 2022

## MEMORANDUM

Darlea Felder, an African American female teacher at SCI Graterford and then SCI Phoenix, sued the Pennsylvania Department of Corrections and several of its employees. She initially alleged race and sex-based discrimination under Title VII, racial discrimination under § 1981 and retaliation under both statutes. She subsequently stipulated to the individual defendants' dismissal and acknowledged that the § 1981 claims could not proceed against the Department alone. She also withdrew all sex discrimination and retaliation claims.

In the claims that remain, Felder contends she was assigned a more dangerous classroom than white teachers, paid less than her white coworkers, denied necessary classroom supplies, that white colleagues made racist comments and that she was retaliated against for reporting them. After thoroughly reviewing the parties' filings and record evidence and holding oral argument, the Court grants the Department's Motion and enters judgment for the Department on all remaining claims. Many of Felder's allegations and theories are based on assumptions, suspicions and speculation

1

with no support in the record.  What the record evidence shows conclusively is that
Felder never suffered an adverse employment action, precluding any reasonable jury
from returning a verdict in her favor.

I

A

Felder works for the Department as a business technology occupational teacher.
(Felder Dep. 27:22–23, Ex. 1, ECF 18-1.)  She began her employment in April of 2014 at
SCI Graterford, which was replaced by SCI Phoenix in July of 2018.  (Def.'s Statement
of Undisputed Material Facts ("SUMF") ¶ 2, ECF 18.)  Felder is the only business
education teacher at the prison.  *See* (Felder Dep. 33:15–24).

SCI Phoenix Principal Michael Barr was Felder's direct supervisor between April
of 2014 and March of 2021, when he retired.  (Barr Dep. 24:19–23, Ex. 16, ECF 18-16;
Felder Dep. 34:24–35:11.)  Superintendent Jamie Sorber oversees SCI Phoenix's day-to-
day operations.  (Sorber Dep. 23:5–15.)  Joseph Terra is his deputy.  (Def.'s Resp. to
Interrogs. No. 2, Ex. 13, ECF 18-13.)  Terry Fazio, chief of the Department's Division of
Correction Education, supervises all Pennsylvania state prisons' education programs.
*See* (Fazio Dep. 23:11–18, Ex. 4, ECF 18-4; Aug. 28, 2020 Fazio Decl. ¶ 1, Ex. 12, ECF
18-12).

Mark Smida, Matthew Cruise and Terry Chrapacz are white male teachers in
the prison's education department.  (Def.'s SUMF ¶¶ 7–9; Def.'s Resp. to Interrogs. No.
2.)  Another teacher, Mary Irvin, is a white female.  (Def.'s SUMF ¶ 8.)  Ivan Markley is
a white male vocational instructor of carpentry.  (Felder Dep. 51:19–52:1, 62:19–22.)
And Theresa Snyder is an African American guidance counselor.  (Def.'s SUMF ¶ 10.)

2

No teacher, vocational instructor or guidance counselor has authority to promote, demote or fire Felder, adjust her pay or complete her performance reviews. (Felder Dep. 96:8–97:1.)  In 2020 and 2021, her supervisors rated her performance as "[c]ommendable" or "[o]utstanding" in every category.  (Def.'s SUMF ¶¶ 20–22.)  Felder remains a Department employee but is currently on workers' compensation leave for an unrelated issue.  (Felder Decl. ¶ 23.)

New teachers are placed into salary tiers based on their educational credentials, defined by transcripts.  (Fazio Dep. 67:2–14.)  Felder has bachelor's, associate's and master's degrees.  (Felder Decl. ¶ 29.)  Her original salary placement did not take all of them into account.  *See* (Orig. Salary Placement Recomm., Ex. 10, ECF 18-10; Felder Dep. 80:19–24.)  Several months later, her salary was increased after she submitted additional transcripts.  *See* (Revised Salary Placement Recomm., Ex. 11, ECF 18-11; Felder Dep. 82:7–20).  The upward adjustment was paid prospectively and retroactively.  (Def.'s SUMF ¶ 38.)  Felder also received a pay raise in 2020.  (Felder Dep. 206:7–16.)

In the winter of 2018-19, Felder believed that Cruise was being overpaid.  *See* (Aug. 28, 2020 Fazio Decl. ¶ 5).  Fazio's office concluded that was the case, and the excess was recovered.  (*Id.*; Fazio Dep. 72:19–73:4, 99:7–100:2.)  Around the same time, Chrapacz unsuccessfully sought a salary increase.  *See* (Aug. 28, 2020 Fazio Decl. ¶ 6).

Classroom supplies have been an "ongoing" problem at SCI Phoenix (as they were at SCI Graterford).  (Fazio Dep. 43:18–20.)  There have "always" been complaints from "all staff" about untimely orders and receipts.  (*Id.* at 43:20–21, 44:2–5); *see also* (Dec. 9, 2019 email, Ex. 14, ECF 18-14 (union representative reporting a "major"

concern in the education department about a "lack of resources needed to do daily operations")). Amid the pandemic, only "necessary supplies" were ordered because of a "really tight" budget. (Fazio Dep. 44:8–11.)

Felder acknowledges supplies were "often an issue" at the prison but states she was "singled out and treated markedly differently" than her white coworkers. (Felder Decl. ¶ 10.) Although Barr's response to Felder's supply requests was "delayed," he did not deny any of them. *See* (Def.'s Resp. to Interrogs. No. 12; Terra Dep. 65:16–19, Ex. E, ECF 20-6). When Terra learned of the delay, he arranged for outstanding requests to be fulfilled. *See* (Def.'s Resp. to Interrogs. No. 12 addendum). According to Barr, Felder's supply issues "in general" were not "more substantial" than other teachers'. (Barr Dep. 81:12–15.) Supply requests, however, were "taking longer" for her—because either they were for a new classroom or only copy paper could be ordered at the time for budgetary reasons. *See* (*id.* at 80:2–5, 81:20–22, 82:5–8).

Felder was not alone in needing to make multiple requests for classroom materials. (Terra Dep. 66:11–17.) One white male teacher quit a short time after being hired because his supply was inadequate. (Felder Dep. 48:24–49:2, 49:10–50:3.)

Felder acknowledges working at a maximum-security prison like SCI-Phoenix can be "very dangerous." (*Id.* at 23:23–24:1.) Her first classroom there was near a disciplinary hearing room for inmates. (Sorber Dep. 80:9–18, Ex. 9, ECF 18-9.) According to Felder, a security officer once told her this area is dangerous. (Felder Decl. ¶ 6.)

Inmates are enclosed in a metal cage during hearings, and there have been no reports of violent incidents in or around the room during Felder's tenure. *See* (Barr

Dep. 48:2–11, Ex. F, ECF 20-6; Sorber Dep. 84:22–85:7). Like all teachers, Felder must keep her classroom door unlocked while inside for safety reasons. (Sorber Dep. 83:13–84:14.)

B

1

On June 1, 2020, Felder submitted an incident report in which she alleged that several of her white colleagues made racist comments that day. *See* (Ex. 7, ECF 18-7). Specifically, she claimed she overheard racially offensive remarks from Cruise, Irvin and Smida about the protests sparked by George Floyd's murder. (*Id.*) Felder heard them describe African American protesters as "animals" while joking and laughing. (*Id.*)

She asserted that before a staff meeting a short while later, Smida, Cruise and Irvin walked into the room with "contemptuous smirks." (*Id.*) Smida then leaned toward Felder and asked, "Didn't I see you on TV yesterday [protesting] on the Art Museum steps?" (*Id.*) Felder alleged Smida repeated his question after she told him to "not even go there with your racial stuff" and threatened to report him. (*Id.*) Felder contended Smida, Cruise and Irvin were smirking and laughing during her exchange with Smida. (*Id.*) She sought out mental health treatment after this incident. *See* (Felder Dep. 198:12–199:24, 204:11–205:6).

According to Felder, Smida was reprimanded several months earlier for printing a racially offensive image. (Felder Decl. ¶ 16.) The record contains no evidence of its content or that Felder ever saw it. *See* (Oral Arg. Tr. 57:7–14). Nor are there any details about Felder's claim that he was moved to a classroom "directly next to" hers

5

after her report.  (Felder Decl. ¶ 24.)  Felder also testified she previously heard Cruise call Snyder a "black bitch," likely some time in 2019.  *See* (Felder Dep. 154:17–155:1, 208:22–209:3; Oral Arg. Tr. 53:17–24).

Prison employee harassment complaints are referred to an Equal Employment Opportunity office for the Department, and that office immediately investigated Felder's incident report.  (Sorber Dep. 29:8–30:7; Def.'s SUMF ¶ 25.)  It contacted her within a few days of her June 1, 2020 filing, and she heard from an investigator shortly thereafter.  (Felder Dep. 149:5–150:8, 150:14–151:12.)

Sorber, who was "appalled" when he read Felder's report, contacted the human resources director and asked what could be done to prevent the sort of conduct she alleged.  (Sorber Dep. 47:22–24, 48:15–17.)  They discussed reaffirming discrimination and harassment policies with education department employees.  (*Id.* at 48:11–14.)  At a meeting likely held on June 4, 2020—and no later than a week after Felder filed her report on June 1—Sorber recited a policy statement drafted by HR.  *See* (*id.* at 59:20–60:13; June 4, 2020 emails, Ex. J, ECF 20-6; Def.'s SUMF ¶ 29).  This meeting would become the focus of Felder's retaliation allegations.  *See infra* subsection I.B.2.

On July 9, the prison education department conducted a training program called COLORS.  (Training Roster, Ex. L, ECF 22-4.)  Smida and Irvin were two of the teachers who participated.  (*Id.*)  The program emphasized awareness of how language affects others, as well as "team building, working together and professionalism."  (Sorber Dep. 56:17–23; Fazio Dep. 59:22–23.)  The COLORS training supplemented the education department employees' annual harassment and discrimination training,

which provides, among other things, instruction on diversity, equity and inclusion. (Fazio Dep. 26:13–27:6; Sorber Dep. 33:11–20; Def.'s Resp. to Interrogs. No. 4.)

On August 31, 2020, the EEO office completed the summary of its investigation into Felder's June 1 complaint. (Invest. Summ., Ex. 8, ECF 18-8.) The investigation took roughly three months and involved interviews of at least nine prison employees, including Felder, Smida, Irvin, Cruise and multiple witnesses. *See* (*id.* at 243–46). It found there was "no proof" that Smida, Irvin or Cruise referred to African American protesters as animals. (*Id.* at 246.) It further determined that while Smida did sarcastically ask Felder about her participation in the protests, this was an "isolated incident" and there was insufficient evidence to establish Felder was "racially harassed." (*Id.*)

2

There are conflicting accounts of what occurred at the June 4, 2020 education department meeting in which Sorber read HR's policy statement. According to Felder, Sorber, while staring at her, said "too many" people were filing complaints to the EEO office. (Felder Interview Statement No. 7, Ex. G, ECF 20-6.) Sorber then read the policy statement. (*Id.*) Next, Terra joined the meeting and assigned Felder an additional classroom on the east side of the prison. *See* (*id.*). When Felder asked him if this meant she "would be the only teacher going back and forth" across the prison complex, Terra said "yes! This is not open for a debate! Do as you're told!" (*Id.*) She subsequently contacted the EEO office to complain she was being retaliated against. *See* (Pl.'s Counter Statement of Disputed Material Facts ("CSDMF") ¶ 73, ECF 20-3).

Sorber denied stating too many EEO complaints were being filed, and Terra said he never told Felder not to question him about the assignment. (Sorber Dep. 64:15–20; Terra Dep. 52:13–16.)  Sorber said Felder was assigned an additional classroom based on a COVID-19 mitigation policy barring cross-prison inmate travel.  (Invest. Summ. 244.)  He explained inmates previously were allowed to cross the prison for education and employment, among other matters.  (Sorber Dep. 72:7–10.)  After the CDC recommended quarantining, cohorting and zoning to curb the virus's spread, "one of the first things early in the pandemic we knew we could do was at least stop that crossover."  (*Id.* at 72:13–21.)  Sorber made the decision to alter that practice.

Terra, however, made the decision to assign Felder the extra classroom.  (Terra Witness Statement No. 3, Ex. 15, ECF 18-15); *see also* (June 3, 2020 emails, Ex. M, ECF 22-5 (Terra explaining "no inmates will be permitted to crossover from east to west and west to east").  Since Felder is the only business education teacher, it was impractical and would create "logistical" problems to have her "in the same classroom all day." (Terra Witness Statement Nos. 2–3.)  More generally, it is "easier" to have staff cross over than inmates.  (*Id.* at No. 3)

Felder is not the only teacher or instructor who has recently worked on both sides of SCI Phoenix.  During Felder's leave, Irvin taught technology to an inmate housed on the prison's east side even though her assigned classroom is on the west side. (Dec. 15, 2021 Fazio Decl. ¶¶ 5, 8, ECF 22-1.)  Irvin met with the inmate in an east-side classroom to "provide direction and answer questions"; educational packets are also sent to his cell.  (*Id.* at ¶¶ 9, 11.)

C

On July 1, 2020, Felder filed a discrimination charge with the federal Equal Employment Opportunity Commission.  (EEOC Charge.)[1]  She alleged continuing violations in the form of race and sex discrimination "[f]rom the outset" of her Department employment.  (EEOC Charge ¶¶ 1, 13.)  The EEOC dismissed Felder's charge and issued notice of her right to sue on March 1, 2021.  (Ex. 18, ECF 18-18.)

On April 1, 2021, Felder filed this lawsuit against the Department, Sorber, Terra and Fazio.  (ECF 1.)  She alleged race and sex discrimination under Title VII, race discrimination under § 1981 and retaliation under both statutes.  (Compl. ¶¶ 57–69.) The Department moved for summary judgment.  (ECF 19.)  The parties had previously stipulated to dismiss Sorber, Terra and Fazio, enabling the Court to enter judgment on Felder's § 1981 claims.  (ECF 16.)[2]  She subsequently responded to the Motion, and the Department filed a reply.  (ECF 20; ECF 22.)  In her briefing and at oral argument, Felder withdrew all her sex-based claims, leaving only her claims for race-based discrimination and retaliation under Title VII.  (Oral Arg. Tr. 4:15–23.)

---

[1]     Only the charge's cover page is docketed as an exhibit.  (Ex. 17, ECF 18-17.)  The Court relies on the full charge, which plaintiff's counsel submitted after oral argument and which the Court has appended to the exhibit.

[2]     These claims cannot go forward against the Department, a state executive agency.  *See McGovern v. City of Phila.*, 554 F.3d 114, 120–21 (3d Cir. 2009) (explaining the "express cause of action for damages created by § 1983 constitutes the exclusive federal remedy for violation of the rights guaranteed in § 1981 by state governmental units" (quoting *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 733 (1989))); *see also* (Oral Arg. Tr. 4:2–8, ECF 28) (Plaintiff counsel acknowledging failure of claims).

II

A

Summary judgment is proper if the movant shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed R. Civ. P. 56(a). A fact is material if it may affect the case's outcome "under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A genuine dispute exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* A mere "scintilla" of evidence supporting the nonmoving party will not suffice. *Id.* at 252. Rather, to avoid summary judgment, the nonmovant must "set forth specific facts showing that there is a genuine issue for trial" and cannot "rest upon" pleadings. *Id.* at 256. These facts must allow it to "make a sufficient showing on essential elements" of its case that it bears the burden of proof on. *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 643 (3d Cir. 2015).

The Court can consider any material in the record that may be admissible at trial. *See* Fed. R. Civ. P. 56(c); *Pamintuan v. Nanticoke Mem'l Hosp.*, 192 F.3d 378, 387 n.13 (3d Cir. 1999). It "must view the facts in the light most favorable to the nonmoving party and draw all inferences" in its favor. *Prowel v. Wise Bus. Forms*, 579 F.3d 285, 286 (3d Cir. 2009) (internal quotation marks omitted) (quoting *Norfolk S. Ry. Co. v. Basell USA Inc.*, 512 F.3d 86, 91 (3d Cir. 2008)). But it need not credit "[u]nsupported assertions, conclusory allegations, or mere suspicions." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010). If a claim is supported by factual record evidence, the nonmovant must "direct the District Court's attention to those facts." *Collins v. Kimberly-Clark Pennsylvania, LLC*, 247 F. Supp. 3d 571, 585 (E.D. Pa. 2017) (internal quotation marks omitted). Additionally, the Court may not

10

make credibility determinations or weigh the evidence.  *See Parkell v. Danberg*, 833 F.3d 313, 323 (3d Cir. 2016) (quoting *Armour v. Cty. of Beaver*, 271 F.3d 417, 420 (3d Cir. 2001)).

B

Felder's racial discrimination (disparate treatment) and retaliation claims are governed by the burden shifting analysis from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).  The plaintiff first must establish a *prima facie* case.  *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013).  If the plaintiff does so, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason'" for its adverse employment action.  *Id.*  If the defendant succeeds, the burden shifts back to the plaintiff to prove the defendant's reason was a pretext for discrimination.  *See Castleberry v. STI Grp.*, 863 F.3d 259, 263 (3d Cir. 2017).  Though the burden of production shifts, the plaintiff retains the "ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against" her.  *Jones v. Sch. Dist. of Phila*, 198 F.3d 403, 410 (3d Cir. 1999).

III

A

Title VII of the Civil Rights Act of 1964 forbids employers from discriminating against any individual "with respect to [her] compensation, terms, conditions, or privileges of employment, because of" her race.  42 U.S.C. § 2000e-2(a)(1).  A race discrimination case's "central focus" is "whether the employer is treating some people less favorably than others because of their race."  *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577 (1978) (internal quotation marks omitted).  To make out a *prima facie*

11

discrimination case, a plaintiff must show she (1) belongs to a protected class; (2) was qualified for her position; (3) suffered an adverse employment action; and (4) the circumstances surrounding the adverse employment action give rise to an inference of unlawful discrimination. *See Burton*, 707 F.3d at 426.

An adverse employment action is "serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015) (quoting *Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004)). Examples include termination and failure or refusal to hire. *See Komis v. Sec'y of U.S. Dep't of Labor*, 918 F.3d 289, 292 (3d Cir. 2019) (citing § 2000e-2(a)(1)).

But there is no Title VII relief for "unpleasantness" or "frustrati[on]" in the workplace. *Walker v. Centocor Ortho Biotech, Inc.*, 558 F. App'x 216, 219–20 (3d Cir. 2014). Nor are "[c]hanges in duties or working conditions that cause no materially significant disadvantage" adverse employment actions. *Harlston v. McDonnell Douglas Corp.*, 37 F.3d 379, 382 (8th Cir. 1994). Specifically, there is no adverse employment action merely because one's office "may have changed." *Langley v. Merck & Co.*, 186 F. App'x 258, 260 (3d Cir. 2006); *see also Forkkio v. Powell*, 306 F.3d 1127, 1130–31 (D.C. Cir. 2002) (explaining "[p]urely subjective injuries" like "dissatisfaction with a reassignment" are not adverse employment actions).

The Court can infer unlawful discrimination from the identification of a similarly situated employee outside the plaintiff's protected class "who engaged in the same conduct but was treated more favorably." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 170 (3d Cir. 2013). The plaintiff must show she and the comparator are similarly

situated "in all relevant respects." *Butler v. Arctic Glacier USA*, 213 F. Supp. 3d 711, 716 (E.D. Pa. 2016) (internal quotation marks omitted). This test typically requires that the "two employees dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* at 716–17; *Collins*, 247 F. Supp. 3d at 589 (explaining it "often requires" a plaintiff to show the "relevant aspects" of her employment are "nearly identical" (internal quotation marks omitted)).

No inference of unlawful discrimination can arise, however, from "speculations, generalities and gut feelings, however genuine," if they lack factual support. *Paradoa v. Phila. Hous. Auth.*, 610 F. App'x 163, 166 (3d Cir. 2015) (internal quotation marks omitted). A "subjective belief that race played a role" is not enough either. *Groeber v. Friedman & Schuman, P.C.*, 555 F. App'x 133, 135 (3d Cir. 2014). Rather, the plaintiff must point to evidence of racial bias. *See Paradoa*, 610 F. App'x at 166.

The parties agree Felder is a member of a protected class and that she is qualified for her role as a business occupations teacher at SCI Phoenix. (Mot. for Summ. J. 3; Resp. to Mot. for Summ. J. 5.) What remains in dispute is whether Felder suffered an adverse employment action and, if so, whether its surrounding circumstances give rise to an inference of unlawful discrimination.

Felder asserts she suffered the following adverse employment actions: she was initially placed in a classroom at SCI Phoenix near a disciplinary hearing room, denied classroom supplies, accused of carrying contraband, paid less than white colleagues and

subjected to a hostile work environment in the education department.  *See* (Oral Arg. Tr. 36:20–37:3, 42:4–7, 43:17–22, 44:13–16, 51:2–6).

B

1

i

Felder claims being placed near the disciplinary hearing room was particularly dangerous because of the possibility inmates would become irate or violent.  (Resp. to Mot. for Summ. J. 6.)  She alleges a prison officer once told her she should not be in that location because of the elevated danger.  (*Id.* at 6–7.)  This gave her "extreme fear and anxiety," particularly because she was not allowed to lock her classroom door.  (*Id.* at 7; Oral Arg. Tr. 37:20–22.)  Felder contends her white colleagues were not placed in "similarly dangerous" areas and that there were other, safer classrooms available. (Resp. to Mot. for Summ. J. 7.)

As an initial matter, this allegation is time barred.  A Title VII claimant in Pennsylvania has "within 300 days after the alleged unlawful employment practice occurred" to file discrimination charges with the EEOC.  *See* 42 U.S.C. § 2000e-5(e)(1). A discrete discriminatory act is a "separate actionable unlawful employment practice" that "occurred" the day it "happened."  *Mandel*, 706 F.3d at 165; *Nat. R.R. Corp. v. Morgan*, 536 U.S. 101, 110 (2002).  Any claim is time barred if the act falls outside the 300-day window, even if it is "related to acts alleged in timely filed charges."  *Morgan*, 536 U.S. at 113.

Felder's classroom placement occurred in July of 2018, when SCI Phoenix replaced SCI Graterford.  Although Felder does not specify, the Court will assume it

14

took place at the latest possible date: July 31, 2018. That would have given her until May 27, 2019 to file the EEOC charge. She did not file it until July 1, 2020. (EEOC Charge.) Felder stated in her charge—and also checked the appropriate box on the cover page—that all claims are made pursuant to the continuing violations doctrine. *See* (EEOC Charge ¶ 1); *infra* n.6. But at oral argument, Felder said the classroom placement was a discrete act amounting to an adverse employment action for her discrimination claim. *See* (Oral Arg. Tr. 36:20–37:3). She clarified it was not one of the acts constituting an alleged hostile work environment. *See* (*id.* at 82:7–20). As a consequence, the Court interprets the classroom placement as a discrete act that occurred the day it happened—namely, some day in July of 2018. Because Felder filed her charge more than 300 days later, her allegation is time barred.

It fails on the merits too. To start, it is not an adverse employment action. The prison officer's remark—Felder's purported bases for believing it was particularly dangerous to teach near the hearing room—is inadmissible hearsay the Court cannot consider on summary judgment. *See Smith v. City of Allentown*, 589 F.3d 684, 693 (3d Cir. 2009). Even if it could, the classroom placement was not serious or tangible enough to alter the conditions of Felder's employment.

First of all, Title VII is not designed to redress dissatisfaction with a suboptimal office change. *See Langley*, 186 F. App'x at 260. Felder herself acknowledged working at a maximum-security prison like SCI Phoenix can be "very dangerous." (Felder Dep. 23:23–24:1.) Yet she claims to be more scared and anxious from inmates having disciplinary hearings outside her classroom than from inmates inside the classroom while she teaches. In any event, inmates are enclosed in a metal cage during their

hearings, and there have been no reported violent incidents in that area since she began working in the prison.  *See* (Barr Dep. 48:2–11; Sorber Dep. 84:22–85:7).  As for Felder's contention that she cannot lock her door, that prison rule is aimed at precisely what she wants: safety.  *See* (Sorber Dep. 83:13–84:14).

Nor do the circumstances surrounding her classroom placement allow the Court to infer unlawful discrimination.  Absent any support in the record, there is no issue for the jury to evaluate as to whether Felder's white coworkers were not placed in "similarly dangerous" areas of a maximum-security prison.  (Resp. to Mot. for Summ. J. 7.)  That is also true for her contention that she could have been placed elsewhere, particularly given the "unique specifics" required for business education classrooms. (Terra Dep. 57:17–23.)

ii

Felder contends she was persistently denied classroom supplies.  (Resp. to Mot. for Summ. J. 7.)  She claims the inadequate supply went "far above and beyond" what her white colleagues experienced.  (*Id.*)  The record does not support Felder's conclusory assertions.  Classroom supplies have been an ongoing problem for the prison's education department; complaints from all staff members are commonplace.  (Fazio Dep. 43:18–44:5.)  Supplies were even harder to come by during the pandemic for budgetary reasons.  *See* (*id.* at 44:8–11).  Indeed, Felder even admits the supply shortfalls also affected her white coworkers.  *See* (Felder Decl. ¶ 10).  Given the department-wide bottlenecks, Felder's particular problems were no more than an

immaterial change in her working conditions, not an adverse employment action.  *See*

*Harlston*, 37 F.3d at 382.  Frustration is not enough to survive summary judgment.[3]

Felder's claim of discriminatory motive boils down to a subjective belief that race

played a part in her not having supplies on time, which the Court need not credit and

which in any event is insufficient to create an issue for the jury.  She similarly once

criticized IT staff for not moving and programming computers.  (Aug. 17, 2018 email,

Ex. A, ECF 19-1.)  Asked for an explanation, Felder asserted without support that she

was being mistreated based on her race: "I'm black and they are white and nobody else

had this problem."  (Felder Dep. 197:11–17.)

iii

Felder next complains she was accused of possessing contraband.  She claims

security officers made that accusation and searched her after she dropped two books of

matches, which are forbidden on prison grounds.  (Felder Notes 253–54, Ex. B, ECF 19-

2; Def.'s Resp. to Interrogs. No. 14.)  She contends white teachers who also use matches

to smoke were never treated this way.  (Resp. to Mot. for Summ. J. 7–8.)  This

experience was embarrassing and "extremely unpleasant" for her.  (Oral Arg. Tr. 44:6–

7.)

---

[3]     Felder's reliance on *Mondzelewski v. Pathmark Stores, Inc.*, an ADA case, is misplaced.  162 F.3d 778 (3d Cir. 1998).  Felder latches on to a parenthetical for an out-of-circuit case: "holding adverse action does not require loss of money or benefits but rather may consist of changes in location, duties, perks, or other basic aspects of the job."  *Id.* at 788 (describing *Collins v. Illinois*, 830 F.2d 692, 703 (7th Cir. 1987)).  Felder ignores the Third Circuit's more applicable language: "[M]inor or trivial actions that merely make an employee 'unhappy'" are not grounds for relief because "otherwise every action that an 'irritable, chip-on-the-shoulder employee did not like would form the basis of a discrimination suit.'"  *Id.* at 787 (quoting *Robinson v. City of Pittsburgh*, 120 F.3d 1286, 1300 (3d Cir. 1997)).  And the *Mondzelewski* court's conclusion that there was a genuine issue for trial as to whether plaintiff suffered an adverse employment action was based on Pathmark assigning him to work Saturday nights as part of "punishment shifts."  *See id.* at 787–88.  Nothing of the sort happened here.

Felder has not exhausted her administrative remedies with respect to this allegation.  The EEOC complaint's scope defines the later Title VII action.  *See Mandel*, 706 F.3d at 163.  A plaintiff need not exhaust administrative remedies if the suit's allegations are "fairly within the scope of the prior EEOC complaint" or related investigation.  *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984) (per curiam).  Felder claims the contraband incident occurred on March 25, 2021—well after she filed the charge on July 1, 2020, and several weeks after she received notice of her right to sue on March 1, 2021.  (Felder Notes 253–54; EEOC Charge; Ex. 18.)

Felder's allegation also fails substantively.  Nothing about this incident constituted an adverse employment action.  Felder broke a prison rule and she did not like getting caught and being embarrassed.  *See* (Def.'s Resp. to Interrogs. No. 14; Oral Arg. Tr. 44:6–7).  But her emotional discomfort does not entitle her to relief.  *See Walker*, 558 F. App'x at 219–20.  There is also no basis for the Court to infer unlawful discrimination.  Without pointing to anything other than her own notes and declaration, Felder alleges white colleagues who bring matches to work have never been subjected to similar treatment.  (Pl.'s CSDMF ¶ 51; Oral Arg. Tr. 44:6–8.)  No record evidence substantiates this claim.

iv

Felder also contends lesser credentialed white coworkers were paid more than her.  (Resp. to Mot. for Summ. J. 8–9.)  She identified three teachers or instructors she claims unjustifiably had higher salaries: Chrapacz, Irvin and Ivan Markley.  (Oral Arg. Tr. 25:22–26:1.)  Felder's unequal pay allegation is glaringly deficient: there's no record

evidence of her purported comparators' educational backgrounds or how much they made.[4]

Felder concedes her claim as to Chrapacz is false.  (Def.'s SUMF ¶ 40; Pl.'s CSDMF ¶ 40.)  Her pay was increased after she submitted additional transcripts, while his later request for a raise was denied.  *See* (Revised Salary Placement Recomm; Aug. 28, 2020 Fazio Decl. ¶ 6).

Felder also admits to having no firsthand knowledge about salaries.  (Oral Arg. Tr. 45:23–46:3.)  For example, she claims "I believe that I have been paid less than" similarly situated white and male coworkers "throughout my tenure" in the Department and that "I continue to the best of my knowledge to be paid" less than lesser educated colleagues.  (Felder Decl. ¶¶ 28–29.)  She further alleges that "upon information and belief, <u>all</u> teachers within SCI Graterford and SCI Phoenix are paid more" than her.  (Pl.'s Resp. to Interrogs. No. 12, Ex. D, ECF 20-6 (underline in original).)  The Court need not credit any of these mere suspicions.[5]

 Moreover, the only evidence of Irvin's and Markley's educational credentials is Felder's own conclusory statements, purportedly informed by conversations with others, which the Court need not credit for a number of reasons.  *See* (Oral Arg. Tr. 26:19–27:20, 45:15–22); *e.g.*, *Betts*, 621 F.3d at 252.

---

[4]     What the record does show with respect to Felder's pay is that her salary was adjusted early in her Department employment to properly account for her educational credentials, and that she subsequently received a raise.  (Revised Salary Placement Recomm.; Felder Dep. 206:7–16.)

[5]     Unsupported suspicion permeates Felder's declaration, which she submitted as an attachment to her response to the Department's Motion.  (ECF 20-5.)  The declaration is not a "sham," since it does not contradict her earlier deposition testimony.  *See Baer v. Chase*, 392 F.3d 609, 624 (3d Cir. 2004).  But it mostly repeats, in vague and conclusory terms, her allegations in other filings.  Its assumptions and speculation cannot create a genuine issue for trial and, if anything, the declaration makes it even more obvious that the record is at odds with her beliefs.  *See Anderson*, 477 U.S. at 248.

Finally, Markley's position makes clear he is not an appropriate comparator in all relevant respects. *See Mandel*, 706 F.3d at 170 (affirming the district court's determination that plaintiff did not raise an inference of unlawful discrimination because she did not identify similarly situated employees). While he works in the education department with Felder, he is a vocational instructor of carpentry—not an "academic" teacher. *See* (Felder Dep. 51:19–52:1, 62:19–22); *see also* (Fazio Dep. 70:4–71:17 (distinguishing vocational instructors' and teachers' qualifications)).

2

Felder contends she was subjected to a hostile work environment in the education department. (Resp. to Mot. for Summ. J. 9–14.) She does not allege a standalone hostile work environment claim; her complaint's causes of action are for discrimination and retaliation. (ECF 1.) Instead, she argues the hostile work environment is an adverse employment action for purposes of her disparate treatment discrimination claim.[6] (*Id.* at 15.)

Felder later clarified that the following conduct constituted the alleged hostile work environment: Smida sarcastically asking her about participating in the George Floyd protests; the comments from Smida, Cruise and Irvin comparing African American protesters to animals; Cruise insulting Snyder in racial terms; and an "overarching culture of harassment and discrimination" in the education department.

---

[6]     Felder's theory, raised for the first time in response to the Department's Motion, arguably amounts to an impermissible "attempt to amend a complaint through a brief in opposition to a motion for summary judgment." *Cicchiello v. Beard*, 726 F. Supp. 2d 522, 533 (M.D. Pa. 2010) (internal quotation marks omitted); *Treaster v. Conestoga Wood Specialties Corp.*, No. 09-632, 2010 WL 2606481, at *3 (M.D. Pa. June 25, 2010) (explaining it is "well settled that courts need not consider additional claims that are raised for the first time in briefing"). The Court nonetheless interprets her complaint's generalized references to "harassment" as alleging a hostile work environment.

(Oral Arg. Tr. 51:23–52:9, 53:16–19, 55:22–24, 59:6–9.)  Felder claims this culture dates back at least to July 2018, when the prison transitioned to SCI Phoenix from SCI Graterford.[7]  (*Id.* at 65:9–13.)

i

The *McDonnell Douglas* framework does not govern hostile work environment claims.  *See Moody v. Atl. City Bd. of Educ.*, 870 F.3d 206, 213 n.11 (3d Cir. 2017).  To prevail on such a claim, a plaintiff must show (1) the "employee suffered intentional discrimination" because of her race, (2) the "discrimination was severe or pervasive," (3) the "discrimination detrimentally affected" her, (4) the "discrimination would detrimentally affect a reasonable person in like circumstances" and (5) the "existence of *respondeat superior* liability."  *Castleberry*, 863 F.3d at 263 (internal quotation marks omitted).

Under the second prong, Title VII forbids racial harassment "sufficiently severe or pervasive to alter the conditions" of the plaintiff's employment.  *Mandel*, 706 F.3d at 167 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).  Determining "what constitutes severe or pervasive [harassment] does not lend itself to a mathematically precise test," though it is a "relatively high" bar.  *Booker v. Nat. R.R. Passenger Corp.*, 880 F. Supp. 2d 575, 582 (E.D. Pa. 2012) (internal quotation marks omitted).

---

[7]     While she did not file an EEOC charge within 300 days of the move, the allegation is timely under the continuing violation doctrine.  That doctrine authorizes the aggregation of "discriminatory acts that are not individually actionable" to bring a hostile work environment claim.  *Mandel*, 706 F.3d at 165.  These acts can happen at any point if "they are linked in a pattern of actions which continues into the applicable limitations period."  *Id.* (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir. 2006)); *see also Morgan*, 536 U.S. at 115, 117 (explaining hostile work environment claims are "composed of a series of separate acts that collectively constitute one 'unlawful employment practice,'" and that, unlike discrete acts, the occurrence is spread "over a series of days or perhaps years" (quoting § 2000e-5(e)(1))).

The harassment can be "severe *or* pervasive." *See Jensen v. Potter*, 435 F.3d 444, 449 n.3 (3d Cir. 2006) (emphasis in original) (explaining severity and pervasiveness are "alternative possibilities" and that "some harassment may be severe enough to contaminate an environment even if not pervasive," while "other, less objectionable, conduct will contaminate the workplace only if it is pervasive" (internal quotation marks omitted)).  But an isolated incident will not suffice unless it is "extremely serious." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).  This includes "offhanded comments." *Caver v. City of Trenton*, 420 F.3d 243, 262 (3d Cir. 2005).  Title VII is not an "avenue for an unhappy employee to complain." *Welch v. Millersville Univ.*, No. 20-4942, 2022 WL 131258, at *9 (E.D. Pa. Jan. 14, 2022).  Nor is it a "general civility code." *Faragher*, 524 U.S. at 788 (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)); *see also Jensen*, 435 F.3d at 451 (noting "[o]ccasional insults, teasing, or episodic instances of ridicule" do not "'permeate' the workplace and change the very nature of the plaintiff's employment").

The plaintiff's "subjective reaction" is insufficient; she "must also show an objectively hostile work environment." *Jensen*, 435 F.3d at 451.  The Court must look at the "totality of the circumstances," including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)).  Racial harassment from an "[i]mmediate supervisor[]" is "likely to impact[] the work environment far more severely than similar conduct by coequals." *Ellis v. Houston*, 742 F.3d 307, 320 (8th Cir. 2014) (internal quotation marks omitted) (explaining the

"context in which abusive remarks are made and by whom can increase their severity
and the detrimental impact on other employees").

ii

Nothing Felder complains about was severe enough to alter the conditions of her
employment.  First, all comments were made by Felder's coworkers—not her
supervisors.  *See Ellis*, 742 F.3d at 320.  Second, even Felder concedes the conduct is
"unlikely to rise to" the requisite level of severity.  (Resp. to Mot. for Summ. J. 11.)

Smida's questioning Felder about her participation in the George Floyd protests
was offensive, but this isolated incident was not the type of "extremely serious" conduct
required to support a hostile work environment claim.  *Faragher*, 524 U.S. at 788.
Nothing in the record corroborates Felder's allegation that Cruise, Smida and Irvin
referred to African American protesters as animals.  *See* (Invest. Summ. 246).  Indeed,
Felder cannot specify which of these individuals allegedly said such a thing.  (Oral Arg.
Tr. 52:6–7, 21–22; Felder Decl. ¶ 15.)  In any event, such comments do not rise to the
level of a hostile work environment.  *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268,
270–71 (2001) (per curiam) (noting "mere offensive utterance[s]" do not suffice).

In fact, courts have found far more severe conduct fell short of creating a hostile
work environment.  *See Frazier v. Exide Technologies*, No. 11-1863, 2016 WL 6600262,
at *8–9 (E.D. Pa. Nov. 8, 2016) (granting summary judgment when, among other
conduct, an African American man's white supervisor told him "you need to pick up the
pace n*****" after he incorrectly loaded a battery pallet); *Woodard v. PHB Die Casting*,
255 F. App'x 608, 610 (3d Cir. 2007) (per curiam) (concluding harassment was not
severe when, in addition to other incidents, plaintiff saw a KKK and burning cross sign

23

in the bathroom that was not removed for at least three months after he reported it);
*King v. City of Phila.*, 66 F. App'x 300, 305 (3d Cir. 2003) (same when a fellow police
officer called plaintiff a "[n-word]," shoved him and "threatened to sabotage his work
record").

iii

Nor are the alleged incidents pervasive enough to create a hostile work
environment.  As evidence for the alleged "overarching culture" of harassment, Felder
primarily relies on conduct that was either undefined, not directed at her or that she
did not personally experience.  In particular, she points to Cruise calling Snyder a black
bitch, Smida allegedly printing a racially offensive image and emails suggesting "racial
tensions" within the education department.  (Oral Arg. Tr. 53:17–18, 55:20–56:10, 57:7–
14.)  Felder testified she witnessed the Cruise comment.  (Felder Dep. 154:17–155:1,
208:22–209:3.)  It also appears she may have known about at least some of the conduct
described in the emails around when it occurred.  *See* (Oral Arg. Tr. 57:21–58:14).
There is no evidence, however, that she ever saw the printed image or knew of its
content.  (Oral Arg. Tr. 57:7–14.)

Incidents that involve other employees can be "relevant in establishing a
generally hostile work environment."  *Velez v. QVC, Inc.*, 227 F. Supp. 2d 384, 410 (E.D.
Pa. 2002) (internal quotation marks omitted).  The plaintiff must show (1) she "was
aware of the incidents" while employed and (2) "there is a nexus between the
discrimination directed" at her and "that directed at others."  *Id.*  The first element
requires "subjective awareness" of the other incidents, though the plaintiff need not
have witnessed them.  *Id.* at 410–11.  The nexus inquiry is whether, in view of the other

24

incidents, those the plaintiff experienced "would reasonably be perceived and [were] perceived as hostile or abusive." *Id.* at 411 (alteration in original) (internal quotation marks omitted). Relevant factors include whether the "discriminatory acts directed at others were undertaken by the same decisionmaker" who allegedly discriminated against the plaintiff; whether the "acts directed at plaintiff and those directed at other employees occurred in close temporal proximity"; and whether the "type of discrimination" plaintiff complained of is "similar in nature or kind" to that "directed at other employees." *Id.* at 412.

Felder's argument amounts to a tenuous chain of unknowns, evidentiary gaps and speculation. She cannot rely on a nebulous "overarching culture" of harassment to piece together a hostile work environment claim with vague, isolated incidents involving other employees. (Oral Arg. Tr. 55:22–23.)

The printed image is irrelevant because there is no evidence Felder saw it or knew what it depicted. While she claims she witnessed Cruise's remark to Snyder, its nexus to the harassment she suffered is dubious. It is not similar in kind: "black bitch" is an insult targeting one female, while the "animals" remark is an ungendered slur directed at a group. Even if it were, Felder does not even know who made the latter comment; she attributes it generally to Cruise, Irvin and Smida. *See* (Incident Rep. (stating she "overheard Mr. Cruise, Ms. Irvin and Mr. Smida laughing and joking referring to people of color as animals"); Felder Decl. ¶ 15 (alleging "several of my Caucasian coworkers (including Mark Smida and Mary Irvin)," with no mention of Cruise, had "made comments referring to Black people as 'animals'")). Also, Cruise

likely insulted Snyder in 2019—long before the June 1, 2020 incident.  (Oral Arg. Tr. 53:17–24.)

The emails say little or nothing about anything that could reasonably be perceived as hostile or abusive.  Felder did appear to know of at least some of what they seemingly describe: Irvin's allegation that Snyder said Irvin was "taking" African American men away from Snyder.  *See* (June 2, 2020 emails, Ex. H, ECF 20-6; Felder Dep. 162:13–23; Sorber Dep. 40:1–23).  Felder was interviewed in connection with an investigation into this incident.  (Felder Dep. 161:12–163:3.)  But Snyder's alleged comment bears no resemblance to the remarks from Smida, Cruise and Irvin at the heart of Felder's case.  The emails also seem to suggest more generally that racial misconduct in the education department "slowed down" but "never stopped."  *See* (June 2, 2020 emails; Fazio Dep. 56:19–22).  The Court cannot assess this conduct's nexus without knowing more—and the record does not provide it.

Even if the Court could conclude all of this conduct is relevant to what Felder personally experienced, the harassment did not "so pervade[]" the education department as to alter the conditions of her employment.  *Vance v. Ball State Univ.*, 570 U.S. 421, 427 (2013).  In fact, Felder continued to receive positive performance reviews.  (Def.'s SUMF ¶¶ 20–22); *see Welch*, 2022 WL 131258 at *9 (relying on plaintiff's receipt of positive performance evaluations to conclude she failed to demonstrate a hostile work environment).[8]

---

[8]    With respect to the third and fourth prongs of her hostile work environment case, Felder points to her mental health treatment in arguing the harassment had a detrimental effect.  (Resp. to Mot. for Summ. J. 12–13.)  But she sought out care in response to Smida's offensive questioning.  *See* (Felder Dep. 198:12–200:3 (stating she called the State Employees Assistance Program for the first time that day)).  Felder lacks similar evidence for the other acts she alleges constitute a hostile work

iv

Employers can face liability for a hostile work environment based on either a co-worker's or supervisor's acts. *In re Tribune Media Co.*, 902 F.3d 384, 399 (3d Cir. 2018). Felder asserted the alleged harassment was perpetrated solely by non-supervisory coworkers. (Oral Arg. Tr. 95:14–18.) An employer's liability for a coworker's harassing acts is evaluated under a negligence standard. *Vance*, 570 U.S. at 427. Liability attaches only if the employer (1) "failed to provide a reasonable avenue for complaint" or (2) "knew or should have known of the harassment and failed to take prompt and appropriate remedial action." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104–05 (3d Cir. 2009).

There is no dispute prison education department employees had a reasonable avenue to file harassment complaints. *See* (Oral Arg. Tr. 67:7–12). Felder contends the Department's response to her complaint was inadequate. (*Id.* at 66:11–14, 67:17–18.) The record shows otherwise. The EEO office immediately began a three-month investigation into the incident with Smida, Cruise and Irvin that included interviews of at least nine employees. (Def's SUMF ¶ 25; Invest. Summ. 243–46.) It concluded Smida's questioning was an isolated incident and that there was no proof of an alleged reference to the African American protesters as "animals." (Invest. Summ. 246.) Further, Sorber took the complaint seriously; he contacted HR and asked what could be done to prevent the kind of conduct Felder alleged. (Sorber Dep. 47:9–24.) The education department also engaged in additional racial harassment training about a month after the incident. (COLORS Training Roster.) At the end of the day, the

---

environment—including the "overarching culture" of harassment she traces back to at least July of 2018. (Oral Arg. Tr. 65:9–13.)

evidence did not support a finding that Felder was harassed on account of her race. (Invest. Summ. 246.)  That Felder was dissatisfied with the final result does not mean the Department's investigation was inappropriate or inadequate.

## IV

Felder claims the Department retaliated against her for reporting the incident involving Smida, Cruise and Irvin.  (Resp. to Mot. for Summ. J. 14–22.)  She alleges the following retaliatory acts: the early-June meeting in which Sorber recited the policy statement and Terra assigned her an additional classroom on the east side of the prison, her exclusion from education department meetings, the reassignment of Smida to a classroom next to hers and an escalated denial of classroom supplies.  (Oral Arg. Tr. 71:19–24, 72:18–25, 73:7–16.)

## A

Title VII prohibits employers from discriminating against an employee because she has "opposed" an unlawful employment practice or "made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."  42 U.S.C. § 2000e-3(a).  To make out a *prima facie* retaliation case, a plaintiff must show (1) she engaged in protected activity; (2) her employer took an adverse employment action against her; and (3) a causal link between the two.  *See Daniels v. Sch. Dist. of Phila.*, 776 F.3d 181, 193 (3d Cir. 2015).

To establish an adverse employment action, the plaintiff must demonstrate a "reasonable employee would have found the challenged action materially adverse," meaning "it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination."  *Burlington N. & Santa Fe. Ry. Co. v. White*, 548 U.S. 53,

68 (2006) (internal quotation marks omitted).  Title VII's antiretaliation provision

protects employees "not from all retaliation"—only if it "produces an injury or harm."

*Id.* at 67.  For causation, she must produce evidence about the "scope and nature of

conduct and circumstances that could support" a causal link from the protected activity

to the adverse employment action.  *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 279

(3d Cir. 2000).

If the plaintiff establishes a *prima facie* case, the burden shifts to the employer

to come forward with a legitimate, nonretaliatory reason for the adverse action.  *Moore*,

461 F.3d at 342 (citing *McDonnell Douglas*).  The employer has a "relatively light"

burden it can satisfy by articulating "any legitimate reason" for the adverse action,

even if that reason did not "actually motivate[]" it.  *Krouse v. Am. Sterilizer Co.*, 126

F.3d 494, 500–01 (3d Cir. 1997) (quoting *Woodson v. Scott Paper Co.*, 109 F.3d 913, 920

n.2 (3d Cir. 1997)).

If the employer succeeds, the burden shifts back to the plaintiff to prove pretext.

To do so, she must produce "some evidence" from which a reasonable jury could

conclude the "employer's proffered explanation was false" and "retaliation was the real

reason for the adverse employment action."  *Moore v. City of Phila.*, 461 F.3d 331, 342

(3d Cir. 2006).  "But for causation" is required at this stage.  *See Carvalho-Grevious v.*

*Delaware State Univ.*, 851 F.3d 249, 258 (3d Cir. 2017).

B

1

Felder engaged in protected activity by filing her incident report on June 1, 2020, following up with the EEO office by email on June 4 and then filing an EEOC charge on July 1.  (Ex. 7; Ex. J; EEOC Charge.)  She cannot, however, show an adverse employment action or causation.  Even if she could, the Department had a legitimate nonretaliatory reason for its actions, and she fails to proffer any evidence it was pretextual.

Her retaliation claim centers on the meeting—which likely took place on June 4—in which Terra assigned her an additional classroom on the east side of SCI Phoenix.  (Resp. to Mot. for Summ. J. 16–18.)  As an initial point, Terra likely knew about the incident report before the meeting: he appears to have attached it to a June 2 email to the HR director.  *See* (Ex. H); *Daniels*, 776 F.3d at 196 (explaining a plaintiff cannot show causation "without some evidence that the individuals responsible for the adverse action knew" about the protected activity when they acted).  Still, the assignment would not dissuade a reasonable employee from complaining about discrimination.  Walking across the prison complex may inconvenience Felder, but Title VII distinguishes "significant from trivial harms."  *See Burlington Northern*, 548 U.S. at 68.

The same holds for the alleged reassignment of Smida to a classroom next to hers: even if this made Felder uncomfortable given his prior comments, the statute protects only against retaliation that actually harms her.  *Burlington Northern*, 548 U.S. at 67.  Felder's supply issues were likewise no more than "minor annoyances."  *Id.*

30

at 68.  These issues affected the whole education department and, as Felder put it, only "arguably" escalated following her protected activity.  (Resp. to Mot. for Summ. J. 18.)

Finally, Felder's allegation that she was excluded from meetings is too threadbare for the Court to even assess whether it was a materially adverse employment action.  *See* Fed. R. Civ. P. 56(c).  Without pointing to anything in the record, Felder claims Terra "deliberately" excluded her from meetings her coworkers were invited to.  (Felder Decl. ¶ 27.)  Felder can't even say how many meetings were held without her.  *See* (Felder Dep. 138:12–16).

Felder also fails to prove causation.  True, there is a temporal link between her filing the incident report on June 1, 2020 and the additional classroom assignment at the June 4 meeting.  (Ex. 7; June 4, 2020 emails.)  Less clear is when, in relation to the report being filed, Smida's classroom was moved, Felder's supply problems escalated and she was excluded from meetings.[9]  *See* (Pl.'s CSDMF ¶¶ 72, 76; Felder Decl. ¶¶ 25–26).  Felder contends the "timing here is too unusually suspect."  (Resp. to Mot. for Summ. J. 27.)  She may feel that way, but her suspicions don't create an issue for the jury.  And even if she were correct, a "temporal relation," without "other evidence of retaliation," will not get a plaintiff's case past summary judgment.[10]  *Contreras v. Suncast Corp.*, 237 F.3d 756, 765 (7th Cir. 2001).

---

[9]     Felder alleges in her complaint that the Smida move took place "around" June 8.  (ECF 1 ¶ 44.)  Nothing in the record corroborates this, Felder's declaration does not put a date on the move, nor does her summary judgment briefing.  Counsel also didn't know the date when asked at oral argument.  (Oral Arg. Tr. 76:9–14.)

[10]     Felder's allegation that Sorber stared at her when he said at the June 4 meeting that "too many" EEO office complaints were being filed does not establish a retaliatory motive.  (Felder Decl. ¶ 18.)  Felder was not the only teacher who had recently filed a discrimination or harassment complaint.  *See* (Sorber Dep. 40:1–16; June 2, 2020 emails).  Moreover, it was Terra's decision to assign her the second classroom.  (Terra Witness Statement No. 3.)  And the Court need not credit

2

Because Felder has not established a *prima facie* case of retaliation, the Court is not required to proceed to the second and third steps of the *McDonnell Douglas* framework.  She could not climb them anyway.

The Department has carried its light burden of articulating a legitimate, nonretaliatory reason for assigning Felder an extra classroom.  *See Krouse*, 126 F.3d at 500–01.  Sorber and Terra explained the prison was prohibiting inmate crossover as a COVID-19 mitigation measure; as a result, Felder, the only business education teacher, needed to teach on the facility's east and west sides as opposed to having the inmates come to her.  *See* (Sorber Dep: 72:7–73:11; Terra Witness Statement No. 2).  This policy was in place before the June 4 meeting.  *See, e.g.*, (June 3, 2020 emails).

Felder also fails to show pretext.  She has not produced evidence that the pandemic-policy explanation was false or that the classroom assignment really was the product of a retaliatory motive.  *See Moore*, 461 F.3d at 342.  Her main evidence of pretext, Irvin's teaching arrangement during Felder's leave, is actually evidence of equal treatment.  (Resp. to Mot. for Summ. J. 22.)  Irvin too has taught on both sides of the prison.  (Dec. 15, 2021 Fazio Decl. ¶¶ 5, 8–9, 11.)  Felder cannot demonstrate "retaliatory animus played a role in the [Department's] decisionmaking process" and had a "determinative effect" on its outcome.  *Krouse*, 126 F.3d at 501.


An appropriate Order follows.

---

Felder's speculation that Sorber was staring at her intentionally to send a message.  *See* (Felder Decl. ¶ 18).

BY THE COURT:


*/s/ Gerald J. Pappert*
GERALD J. PAPPERT, J.